**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Gregg Steven STRAYHORN, Defendant-
Appellant.**

**No. 392, Docket 72-1879.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 16, 1972.

Decided Dec. 12, 1972.

Frederick H. Cohn, New York City, for appellant.

George E. Wilson, Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty., S. D. N. Y., Peter L. Treubner and Peter F. Rient, Asst. U. S. Attys., of counsel), for appellee.

Before SMITH, KAUFMAN and MULLIGAN, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

Gregg Steven Strayhorn has appealed from a judgment of conviction for willful failure to report for induction, 50 U.S.C. App. § 462(a), entered in the Southern District of New York after a court trial before Judge Harold R. Tyler, Jr. The opinion below is reported at 347 F.Supp. 1186 (S.D.N.Y.1972). The chief issues presented for review concern the proper scope and administration of the order of call defense in Selective Service cases. We find no error in the proceedings below, and affirm.

## I.

As its name implies, the order of call defense involves contentions by a Selective Service defendant that his order for induction came out of proper sequence, or, conversely, that others who should have been called before him were not. Its recognition by this court, United States v. Weintraub, 429 F.2d 658 (2nd Cir. 1970), cert. denied, 400 U.S. 1014, 91 S.Ct. 572, 27 L.Ed. 627 (1971), and by others, Yates v. United States, 404 F.2d 462 (1st Cir. 1968), rehearing denied, 407 F.2d 50 (1969); United States v. Dudley, 451 F.2d 1300 (6th Cir. 1971); United States v. Baker, 416 F.2d 202 (9th Cir. 1969); but see Schutz v. United States, 422 F.2d 991, 994 (5th Cir. 1970), rests on at least two underlying premises. First, the courts have recognized in this and other contexts that the general order of induction has been a matter of some concern to Congress, see Gutknecht v. United States, 396 U.S. 295, 306, 90 S.Ct. 506, 24 L.Ed. 2d 532 (1970); Baker, supra, 416 F.2d at 204–205; Dudley, supra, 451 F.2d at 1303, and that the particular rules covering priority represent considered social, economic, and political judgments about who should be called to serve at what time. See Dudley, supra; United States ex rel. Bayly v. Reckord, 51 F. Supp. 507, 515 (D.Md.1943). Thus, the order of call defense serves to insure that the Selective Service system does not disregard these priorities. But second, and more important, those registrants dealing with the Selective Service, as with any administrative agency, should be able to expect that they will be treated

fairly, according to previously established ground rules. *See* United States v. Griglio, 467 F.2d 572 (1st Cir. 1972), aff'g 334 F.Supp. 1283 (D.Mass.1971). In this regard, the order of call defense serves as a safeguard of the individual's right to be treated with due process of law by federal administrative agencies. *Cf.* Vitarelli v. Seaton, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); Accardi v. Shaughnessy, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954).

But, as always, there are countervailing policies. The government, with its strong interest in national defense, depends upon a well-functioning Selective Service system to provide members of the armed forces. Moreover, even the most efficient of administrative agencies are not infallible, and not every minor slip-up represents such an affront to the priority rules and notions of due process as to require the rather drastic sanction of reversing a criminal conviction for failure to submit to induction. Thus, while the majority of courts have had little difficulty recognizing the existence of the order of call defense, definition of its substantive and procedural parameters has proven more difficult.

This court first approached these problems in United States v. Sandbank, 403 F.2d 38 (2nd Cir. 1968). There, we held that the government need not establish the propriety of the order of call as part of its case in chief against every Selective Service defendant; rather, response from the prosecution was required only when the issue was fairly raised as part of the defense. We thus rejected the doctrine of United States v. Lybrand, 279 F.Supp. 74 (E.D.N.Y. 1967), to the contrary, and every circuit that has since considered the question has followed suit. *Yates, supra;* United States v. Norman, 413 F.2d 789, 792 (6th Cir.), cert. denied, 396 U.S. 1018, 90 S.Ct. 585, 24 L.Ed.2d 510 (1969); *Baker, supra;* Little v. United States, 409 F.2d 1343 (10th Cir. 1969).[1]

In United States v. Weintraub, *supra,* we then sought to define the standard and quantum of proof relevant to the order of call defense. We began there, as we do here, with the statutory directive that decisions of the local board are to be final, 50 U.S.C. App. § 460, and thus cannot be judicially reviewed unless lacking any basis in fact. Estep v. United States, 327 U.S. 114, 66 S.Ct. 423, 90 L.Ed. 567 (1944). Thus, our job in an order of call case is not to second-guess the draft board or to determine the propriety of its actions *de novo,* but rather to determine whether its handling of the challenged call is "so lacking in support in the record as to be arbitrary and capricious." 429 F.2d at 660. As other courts have recognized, such a standard not only reflects the finality policies of the Selective Service Act, but also strikes something of a balance between the individual and societal interests at stake here. *Griglio, supra; Dudley, supra;* United States v. King, 455 F.2d 345 (1st Cir. 1972).

In *Weintraub,* we also noted that once an "apparent departure" from the proper order of call was shown by the defendant, the burden shifted to the government to explain. 429 F.2d at 661. While the government is then required to show the propriety of its actions beyond a reasonable doubt, *see King, supra; Dudley, supra; Baker, supra,* the seemingly heavy demands of that standard must be viewed in light of the "basis in fact" requirement. Thus, what the government must prove beyond a reasonable doubt is not that the local board acted flawlessly, but rather that the defendant was not prejudiced by arbitrary and capricious action.

Moreover, the order of call defense is not made out by exposing any

---

1. Prior to its rejection of the order of call defense, at least with respect to willful refusal to report, in Schutz v. United States, *supra,* the Fifth Circuit had reached a similar conclusion. Lowe v. United States, 389 F.2d 51 (5th Cir. 1968); Greer v. United States, 378 F.2d 931 (5th Cir. 1967).

single error, however egregious, in the order of call. Rather, the record must show actual prejudice to the defendant, wholly unjustified delay of the induction of enough 1A registrants so that if the local board acted correctly, the defendant would not have been called when he was. United States v. Camara, 451 F. 2d 1122 (1st Cir. 1971); United States v. Smith, 443 F.2d 1278 (9th Cir. 1971). Thus, before the number five man of a ten man monthly delivery "list" can receive the benefit of the order of call defense, it must appear that six available registrants with higher priorities[2] have been arbitrarily bypassed.

In practice, the discharge of the various evidentiary burdens outlined above need not be cumbersome. The defendant can meet his initial requirement by merely showing that, at the time of his induction order, there existed enough available 1A's with higher priorities for call than his, whose inclusion on a monthly list would have "bumped" him off. In response, the government need not engage in extended review of the attacked bypasses, but can normally satisfy its burden through documentary evidence and testimony of a local board clerk.

■ At various stages of the proceedings in this case, the defendant, the government, and the district court have expressed some understandable confusion about the precise scope of the government's burden in these cases. While no exact definition is possible, we reiterate what was said in *Weintraub*— only that local board action so lacking a basis in fact as to be arbitrary and capricious will allow a judicial conclusion that another registrant was improperly bypassed. We further hold, as we believe *Weintraub* made implicit, that a record which merely shows that some Selective Service deadlines have been missed, or that regulations have been technically violated, will not suffice.[3] Rather, as Chief Judge Coffin of the First Circuit said in *Griglio, supra*:

"[W]e will not deem a violation of a regulation as applied to third persons a deprivation of due process as to a registrant unless it is apparent that favoritism to another or discrimination against the registrant was intended, or unless the violation is so flagrant and serious that, whether intended or not, concern for fair and efficient administration justifies the sanction of voiding an induction adversely affected by the violation."

■ Moreover, in the interest of efficient administration of justice, we take this opportunity to set down guide-

---

2. The institution of the draft lottery does not eliminate the order of call defense; it merely realigns the priorities involved. While under the former system the general priority rule was "oldest first," the order of call is now basically determined by the position assigned to a registrant's birthday in the lottery. *Compare* 32 C.F.R. § 1631.6 (1972) *with* its outdated analogue, 32 C.F.R. § 1631.7 (1969).

3. We do not read the Ninth Circuit's opinion in United States v. Smith, *supra*, as holding to the contrary. In that case, the local board had violated 32 C.F.R. § 1626.14, requiring the forwarding of a registrant's file to the appeals board no later than five days after the expiration of the appeal period, by an unexplained delay of seven months in one case and almost two years in another. Thus, while the opinion in *Smith*, does at one point note that improper bypass is made out when it is shown that "the delay was in direct violation of a specific regulation," 443 F.2d at 1280, it is important to remember the factual context in which that statement was made. Indeed, we note that in treating the order of call defense in United States v. Lee, 454 F.2d 192 (9th Cir. 1972), the court specifically said that the defendant had to show not only a regulation violation, but also "that the result *delayed significantly* the time at which higher priority registrants became fully acceptable for induction." 454 F.2d at 193 (emphasis added). After citing *Smith*, the court went on to note that it did not have before it such a case, since, "In none of the cases presented did the delay seem arbitrary or discriminatory." *Id.* at 194.

lines for the future handling of the order of call defense in the district courts. We agree with the decisions in *King, supra,* and United States v. Lloyd, 431 F.2d 160, 164 (9th Cir. 1970), that the order of call defense, going as it does to the validity of the induction order, is properly heard by the court, not the jury. *Cf.* Cox v. United States, 332 U. S. 442, 452–453, 68 S.Ct. 115, 92 L.Ed. 59 (1947). Consequently, in light of the broad discovery permitted by the federal rules, the minimal initial burden placed on the defendant, and the technical nature of the defense, we hold that it is one properly raised before trial through a motion for a judgment of acquittal. *See King, supra,* 455 F.2d at 354. Aided by liberal discovery, the motion should sufficiently identify those registrants whose bypass the defendant is attacking.[4] The district courts may deem the order of call defense waived, in trials beginning after January 1, 1973, if the issue is not raised in the above manner.

 The motion should be heard by the district court prior to trial,[5] at least where jury trial has been demanded.[6] This procedure will avoid interrupting jury trial for the raising and determination of the order of call defense, and, if the defense is meritorious, will obviate the necessity for impanelling a jury at all. Of course, at the hearing on the motion for acquittal, the substantive parameters of the defense will be those outlined above.

## II.

We turn then from basic principles to the particular facts of this case. Since Judge Tyler's opinion fully sets forth the relevant findings of fact, we shall refer to them here only as necessary.

Strayhorn was the number nineteen man of a total of thirty-eight in the relevant September, 1969, call. Thus, as Judge Tyler recognized, in order for him to prevail, the government had to "lose" on twenty registrants or more out of the forty-four challenged in this case. Or, put another way, if it appears that less than twenty registrants here were improperly bypassed, the defense must fail.

As Judge Tyler held, Strayhorn properly discharged his initial burden by identifying forty-four registrants who had 1A classifications and priorities higher than his on the date of his induction order and who were not called. The parties then stipulated that ten of these registrants were correctly bypassed, leaving thirty-four at issue. The government's case with respect to this group was complicated by a factor peculiar to this case. Strayhorn's draft board had been the object of a "trashing" incident on July 1 or 2, 1969; the board's files were extensively damaged and destroyed. Thus, many of the registrants' files at issue here had to be reconstructed in the period prior to trial; some were still unavailable.

 Quite reluctantly, Judge Tyler began by extending the benefit of the doubt to Strayhorn with respect to fourteen registrants whose files were rendered "unclear" by the trashing incident. He did so largely on the basis of United States v. Dudley, *supra,* which he read as precluding the use of expert testimony about the status of challenged registrants where case files and documents are not produced. While we do not quarrel with the result reached, we read *Dudley* more narrowly. That case does not hold that oral testimony can never be used to meet the government's bur-

---

4. Of course, in order to safeguard the confidentiality of Selective Service files, the district judge can enter appropriate protective orders governing discovery. *See Weintraub, supra,* 429 F.2d at 661.

5. As the First Circuit noted in *King, supra,* 455 F.2d at 354, these motions may well

be the kind in which the district court may resort to the aid of a magistrate.

6. Of course, if jury trial has been waived, the district court may consolidate this hearing with the trial on the merits. *King, supra.*

den, nor does it hold that the unavailability of files, for whatever reason, prevents other proof of proper bypass. Rather, in *Dudley* the government attempted to meet its burden through a general explanation of why the induction of registrants may be delayed—pending appeals, physical examinations, etc. There was no attempt to explain why the particular registrants at issue were bypassed. While the Sixth Circuit held that kind of testimony to be insufficient to meet the prosecution's burden, it did not rule that particularized testimony about the reasons for not inducting individual registrants at a particular time would be insufficient. Similarly, while the *Dudley* court implies that the best evidence in an order of call case is a registrant's file, 451 F.2d at 1304, n. 5, it clearly does not preclude other means of satisfying the government's burden, particularly where the file is, for good reason, unavailable or incomplete. While the usual procedure should be to produce the files in question, if such a course is impossible we do not see why oral testimony about the specific reasons for bypassing an individual registrant cannot be used by the prosecution in an order of call case.

After "crediting" these fourteen registrants to the defendant, Judge Tyler went on to find that the government had proved beyond a reasonable doubt that each of the remaining twenty registrants at issue was properly bypassed. We agree. The record shows that virtually every bypass, if not all, was technically correct under the regulations; those few that are at all questionable clearly do not represent arbitrary or capricious action, particularly when taken in the context of a local board that had been the recent victim of criminal vandalism. We thus affirm Judge Tyler's conclusion that Strayhorn's order of call defense must fail.

### III.

Appellant's other contentions are far less troublesome. Strayhorn contends that reversal is mandated by the fact that the local board had destroyed a number of outdated Form 116's, a statistical feeder report about the status of 1A registrants. He claims that if this report had been available, he might have been able to show that his local board had contributed more than its share of inductees in the past, and that the September, 1969, quota was consequently disproportionate.

The claim is without merit. It is clear that Strayhorn does not claim that the records were destroyed in bad faith, or that the local board was told that he needed them. Instead, they were disposed of in accordance with routine regulations. Moreover, Strayhorn's attack on the quota system was not raised until time of trial; even when raised, it was based wholly on conjecture. Under these circumstances, the presumption of regularity which surrounds the administrative establishment of local board quotas is hardly overcome, and the destruction of the outdated documents was not prejudicial. *See* United States v. Hall, 449 F.2d 1206, 1208 (5th Cir. 1971).[7]

Strayhorn next claims that a statement he made in completing a DD 98 (Loyalty Questionnaire) at the AFEES constituted an inarticulate request for conscientious objector status, and that the local board erred in not so treating

---

7. Our disposition of this issue makes it unnecessary for us to consider the merits, or even the availability of a defense to an order for induction based on irregularities in a local board quota. For cases in which variations of this defense were raised, and rejected, *see* United States v. O'Riley, 459 F.2d 53 (9th Cir. 1972); United States v. De Smet, 456 F.2d 1311 (9th Cir. 1972), aff'g mem. 5 SSLR 3087 (N.D.Cal.1971); United States v. Howells, 452 F.2d 1182 (9th Cir. 1972).

it.[8] Judge Tyler found that the statement at best represented "political and particular" views about war, *see* Gillette v. United States, 401 U.S. 437, 458, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971), and thus did not rise to the level of statutory conscientious objection. We agree. Indeed, the record as a whole indicates that, far from opposing war, Strayhorn viewed it as a convenient method for the resolution of class and racial disputes.[9]

The final claim is that the "six months" rule, Rule 4 of the Second Circuit Rules Regarding Prompt Disposition of Criminal Cases, was violated in this instance. The contention is frivolous. The indictment was filed here on September 1, 1971, and the government filed its notice of readiness for trial within 45 days. True, the government did not fully comply with a discovery order until late February, 1972, but even if the latter date is controlling, it was within the six month period. Indeed, the motion to dismiss on this ground was argued on the day the case was first called for trial, March 2, 1972, which was six months and one day after the indictment. Since the government was obviously ready for trial well within the six month period and so notified defendant and counsel, there was clearly no reversible error here.

The judgment is affirmed.

8. The statement reads as follows:
"I am a member of the Black Panther Party. I cannot see myself serving people who will stop at nothing to have their own way (which is a total whitewash of the universe)."
Strayhorn also contends that the following language in a letter he sent to the local board should be read as a CO claim:
"I did not show up for my physical because I do not think I am obligated to do anything for people who oppress, murder and exploit all non-whites on the face of the earth, furthermore, if the government wants to continue their course of destruction upon all non-*pigs* they will do it without *me*."
(Emphasis in original).

9. For example, Strayhorn filled out a DD 398 (Personal History Statement) at the AFEES as follows:
"The United States Government should be overthrown by the use of arms—The only thing that you pigs understand is a 12 Gauge. Black people and all other oppressed people must end this tyranny and open facism [sic] through armed struggle to insure their own safety and to oust this decadent system of capitalism, imperialism, and racism. The masses of people must learn how to counterattack."
On other occasions, he informed the local board that "The time to pick up the gun is now," and returned their letters to him with inscriptions such as "Total Destruction to the Pigs," and "Bring The War Home To Babylon."